UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LINDA SEPULVEDA, on behalf of A.S.,

                    Plaintiff,

   -v-                                                5:11-CV-822

CAROLYN W. COLVIN, Acting Commissioner of
Social Security,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                  OF COUNSEL:

HOWARD D. OLINSKY, ESQ.
Attorney for Plaintiff
300 S. State Street, Suite 520
Syracuse, NY 13202

OFFICE OF REGIONAL GENERAL COUNSEL    KATRINA M. LEDERER, ESQ.
SOCIAL SECURITY ADMINISTRATION REGION II
Attorneys for Defendant
26 Federal Plaza Room 3904
New York, NY 10278

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

     This matter is brought pursuant to §§ 205(g) & 1631(b)(3) of the Social Security Act,

as amended, 42 U.S.C. §§ 405(g) & 1383(c)(3), to review a final determination of the

Commissioner of Social Security denying the claim for Supplemental Security Income

benefits brought by Linda Sepulveda on behalf of A.S.[1]  The parties have filed their briefs, including the Administrative Record on Appeal, and the matter has been submitted for decision without oral argument.

## II. BACKGROUND

A.S. filed an application for social security disability benefits on November 3, 2006. Her claim was denied on October 29, 2008, after a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appealed the ALJ's decision to the Appeals Council.  On May 24, 2011, the Appeals Council declined further review of the ALJ's decision.  Thus, the ALJ's decision became the final decision of the Commissioner.

## III. STANDARDS

### A. Standard of Review

The scope of a court's review of the Commissioner's final decision is limited to determinating whether the decision is supported by substantial evidence and the correct legal standards were applied.  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam) (citing Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)); Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)). "Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Poupore, 566 F.3d at 305 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both

---

[1] For simplicity A.S. is referenced as either "A.S." or "plaintiff."  Linda Sepulveda is referenced as A.S.'s mother.

sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S. Ct. 456, 464 (1951)). If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. Id.

However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone, 70 F. Supp. 2d at 148 (citing Johnson, 817 F.2d at 986).

A reviewing court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see Martone, 70 F. Supp. 2d at 148. "Remand is appropriate where there are gaps in the record or further development of the evidence is needed," such as where new, material evidence has become available. 42 U.S.C. § 405(g); Martone, 70 F. Supp. 2d at 148 (citing Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)). A remand for rehearing directing the taking of additional evidence is warranted only if it is shown that there is new, material evidence "'and that there is good cause for the failure to incorporate such evidence into the record'" at the administrative hearing. Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643-44 (2d Cir. 1983) (quoting 42 U.S.C. § 405(g), as amended in 1980)). Remand may also be appropriate if the Commissioner "misapplies the law or failed to provide a fair hearing." Id. at 644. However, where the underlying administrative decision is not supported by substantial evidence, reversal is appropriate because there would be no useful purpose in remanding the matter for further proceedings.

Id. (reversing and remanding solely for calculation of benefits, subject to determination by the district court of any motion by the agency to remand to consider new evidence); Parker, 626 F.2d at 235 (reversing and remanding solely for calculation and payment of benefits); Simmons v. United States R.R. Ret. Bd., 982 F.2d 49, 57 (2d Cir. 1992) (same); Williams, 859 F.2d at 261 (same).

### B. Child Disability Determination—Three Step Evaluation Process

The ALJ must follow a three step evaluative process in determining whether an individual under the age of 18 ("child") is disabled. See 20 C.F.R. § 416.924(a). First the ALJ must determine whether the child is engaging in substantial gainful activity. Id. If the child is engaging in substantial gainful activity she is not disabled and she is not entitled to benefits. Id.

If the claimant is not engaged in substantial gainful employment, then step two requires the ALJ to determine whether the child has a medically determinable impairment or combination of impairments ("impairment(s)") that is severe. Id. If the impairment(s) is not severe, the child is not disabled and is not entitled to benefits. Id. If the child's impairment or combination of impairments is severe, then step three requires that the ALJ determine whether the impairment(s) meets, medically equals, or functionally equals the listings in Appendix 1 of the regulations. Id.; see also id. Part 404, Subpt. P, App. 1; 20 C.F.R. § 416.926 (determining medical equivalence for adults and children); 20 C.F.R. § 416.926a (determining functional equivalence for children).

A claimant may seek review of an adverse decision by the ALJ from the Appeals Council. Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996). If review is granted, the decision of the Appeals Council is the final decision of the Commissioner. Id. If review is denied, then

the final decision is that of the ALJ. Id. The final decision is judicially reviewable pursuant to 42 U.S.C. § 405(g).

## IV. DISCUSSION

A.S. asserts that the ALJ erred in two ways. First, she contends that the ALJ erred in not finding her impairment(s) functionally equivalent to the listings. Second, she argues that the ALJ followed an improper legal standard in evaluating the credibility of her mother's testimony, and consequently his determination is not supported by substantial evidence.

### A. Functional Equivalence

In order to be functionally equivalent to a listing, a claimant's "impairment(s) must be of listing-level severity." 20 C.F.R. § 416.926a(a). An impairment(s) is of listing-level severity where it results in marked limitations in two functional domains or extreme limitations in one functional domain. Id. The limiting effects of a claimant's impairment(s) are evaluated by considering the interactive and cumulative effects of all impairments, even those not found to be severe. Id. This is accomplished by evaluating the limiting effects of the claimant's impairment(s) relative to six domains of functioning. Id. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. Answers to the following questions are assessed to determine the effect the claimant's impairment(s) have on each of the six domains: what activities the child is able and not able to perform; which activities are limited compared to unimpaired children of the same age; whether difficulty with activities occurs "at home, in childcare, at school, or in the community"; whether claimant has "difficulty independently

initiating, sustaining, or completing activities; and the type, amount, and frequency of help required to perform activities. Id. § 416.926a(b)(2).

A limitation is marked if the "impairment(s) interferes seriously with [claimant's] ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(2)(I). There may be a serious limitation to functioning whether a single activity is limited "or when the interactive and cumulative effects of [claimant's] impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" Id. Where standardized test scores are at least two but less than three standard deviations below the mean, it is expected that there would be a marked limitation of functioning. Id. A marked limitation will be found where a standardized test score is two but less than three standard deviations below the mean "and your day-to-day functioning in domain-related activities is consistent with that score." Id. § 416.926a(e)(2)(iii) (emphasis added). Frequent illness or exacerbations may result in a marked limitation in the health and physical well-being domain in the circumstances described in the regulations. Id. § 416.926a(e)(2)(iv).

A limitation is severe if the "impairment(s) interferes very seriously with [claimant's] ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(3)(I) (emphasis added). As with a marked limitation, a limitation may be severe when a single or several activities are limited. Id. A limitation is marked if the "impairment(s) interferes seriously with [claimant's] ability to independently initiate, sustain, or complete activities. Id. Further, a limitation is extreme when it is '"more than marked."' Id. An extreme limitation is expected when a standardized test score is three or more standard deviations below the mean. Id. If a test score is three or more standard deviations below the mean, "and

- 6 -

[claimant's] day-to-day functioning in domain-related activities is consistent with that score," the limitation will be extreme. Id. § 416.926a(e)(3)(iii) (emphasis added).

A.S. first argues that the ALJ erred in finding her limitation marked rather than extreme in the acquiring and using information domain. She next contends that the ALJ should have found a marked limitation in the interacting and relating with others domain.

### 1. **Acquiring and using information—educational activities**

As the ALJ noted, the regulations provide that a child age six to twelve (plaintiff's age) "should be able to learn to read, write, and do math, and discuss history and science." Id. § 416.926a(g)(2)(iv). The child "should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing [the child's] own ideas, and by understanding and responding to the opinions of others." Id.

A January 2005 questionnaire by A.S.'s special education teacher Amy Bleipping noted that plaintiff was at least 1-1/2 to 2 years behind in reading and writing, and that she has severe memory problems. R. at 152. According to Ms. Bleipping, plaintiff had a serious problem in reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and applying problem-solving skills in class discussions. Id. She had a very serious problem in recalling and applying previously learned material. Id. Plaintiff spent at least 2-1/2 hours per day with Ms. Bleipping. Id. at 151. Plaintiff's reading and written language were at grade level 1.5 and math at grade level 2, although she was in grade three. Id.

A.S.'s Individualized Education Plan ("IEP") for the 2006–2007 school year (grade 5) provided for special class inclusion as well as occupational and speech/language therapies. Id. at 161. Additionally, various accommodations for testing were set forth, including but not limited to administering tests in a small group in a separate location, read directions, re-read directions for each page of questions, simplify language in directions, and repeat oral comprehension items more than specified in standard administration directions. Id. Her achievement levels were 1.5 in reading–decoding and reading comprehension, and 2.5 in math computation and concepts. Id. at 162. It was noted that she has "very weak reading decoding skills," her low reading ability affects her learning in all areas, her difficulties span across all curricular areas, and she benefits from repetition to overcome memory weaknesses. Id. In addition, she can concentrate and comprehend information better in several short activities, needs preferential seating to reduce distractions, and needs frequent checks for understanding. Id. at 163. One of the objectives of her grade 5 IEP was to listen to a grade 2 passage and be able to identify the main idea, setting, characters, and events. Id. at 166. Another objective was to recall and apply skills and information learned from a previous day of instruction. Id.

Ms. Bleipping completed another questionnaire in November 2006. At that time Ms. Bleipping had been with A.S. all day every day for 1-1/2 years. Id. at 184. Plaintiff's reading and written language level was 1.5 and math was 2.5. Id. Ms. Bleipping noted that plaintiff reads about four years below her grade level and struggles in all academic areas. Id. at 185. Plaintiff had a serious problem understanding school and content vocabulary, comprehending and doing math problems, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Id. She

had a very serious problem in reading and comprehending written material, providing organized oral explanations and adequate descriptions, and expressing ideas in written form. Id.

For grade 6, A.S.'s IEP included testing accommodations as before, such as providing double time to complete the test, simplify language in directions, and re-reading directions for each page of questions. Id. at 240. She would have books on tape across all environments and throughout the school year. Id. It was noted that plaintiff was at least three years below grade level in reading and had memory issues, impacting all areas of the curriculum. Id. at 242. One of plaintiff's goals for her grade 6 year was to read grade level 2 material for 15 minutes then "answer five teacher guided comprehension questions." Id. at 244. Another goal for her sixth grade year illustrative of her reading difficulties was to "increase her reading decoding skills from beginning 2nd grade level to the late second/early 3rd grade level." Id. at 244.

A.S.'s IEP for her grade 7 year (2008–2009) essentially duplicated the previous year's plan. Compare id. at 239–49 with id. at 250–53. This IEP again stated that she reads on a late first grade to early second grade level. Id. at 251. Her reading level of at least three years below grade level impacts all of her subjects. Id. at 252. Also impacting her learning across all disciplines are her memory issues. Id. Again, a goal for the grade 7 school year was to improve reading level from second grade to third grade. Id. at 253.

The IEP for her grade 8 year was prepared on February 25, 2009. Id. at 255. The IEP provided for the same testing accommodations, special instruction, and speech/language therapy as in previous years. Id. at 255–59. A.S. would be in an inclusive classroom setting with a full-time special education teacher, id. at 255, as she had been

since fourth grade. Again, it was an annual goal for her to read at a second to third grade level. Id. at 259. The same was true for her ninth grade (2010–2011) IEP. Id. at 261–68. This IEP recognized that she was at least four to five grade levels behind in reading, resulting in impacts across the curriculum. Id. at 265.

### 2. **Acquiring and using information—testing**

Patricia Munski, M.A., performed a consultative speech and language evaluation of A.S. on February 3, 2005. Id. at 342–45. On the Clinical Evaluation of Language Fundamentals—IV, she scored two standard deviations below the mean in the following subtests: word classes receptive, receptive language score, word structure, recalling sentences, and core language. Id. at 343. She scored three standard deviations below the mean in formulated sentences and expressive language. Id. Plaintiff's results were one standard deviation below the mean in only two subtests, concepts and following directions, and sentence structure. Id. Ms. Munski stated the following:

> Amanda had difficulty following oral directions containing linguistic concepts. She had difficulty using correct word structures. She was unable to adequately formulate grammatically correct sentence when given a stimulus word as well as recall sentences of increasing length. She also had difficulty comprehending sentence structure and associations among related words.

Id. Ms. Munski opined that plaintiff could follow and understand simple directions and instructions and appeared able to adequately express her wants and needs. Id. at 344. She further stated that plaintiff has "severe delays in both receptive and expressive language," and that the examination results seemed consistent with plaintiff's allegations. Id.

School psychologist Milton Schechter evaluated A.S. on October 24 and November 13, 2006, while she was in fifth grade. Id. at 374–79. He stated that his WISC-IV test results showed average to low average learning potential. Id. at 375. The Woodcock Test of

Achievement 111 results corresponded to a grade level equivalent of 1.5 for broad reading. Id. She had a grade level equivalent of 3.1 for broad math. Id. at 376. Mr. Schechter noted that plaintiff had a difficult time expressing her thought in written form, decoding words, and encoding words. Id. at 376.

Ms. Munski evaluated A.S. again on December 12, 2006. Id. at 380–83. According to Ms. Munski, plaintiff could not "adequately follow oral directions containing linguistic concepts." Id. at 381. She had "difficulty formulating grammatically-correct sentences when given a stimulus word, as well as recalling sentences of increasing length. She had difficulty comprehending and explaining associations among related words." Id. Although Ms. Munski opined that plaintiff could follow and understand simple directions and instructions, and appeared able to express her wants and needs, she found plaintiff to have "a severe receptive language delay with a moderate expressive language delay." Id. at 382.

Dr. Kristen Barry performed a child intelligence evaluation of A.S. on December 12, 2006. Id. at 384–87. Administration of the WRAT-III standardized achievement test yielded a reading/decoding grade equivalent of first grade. Id. at 385. Dr. Barry found plaintiff's general cognitive functioning, verbal reasoning, and nonverbal reasoning abilities fell in the borderline range. Id. at 386. Her short-term auditory memory and visual-motor efficiency were below average. Id. Her visual-constructional skills, expressive vocabulary, and practical judgment mediated by experience were below average. Id. Plaintiff's "abstract categorical reasoning [was] significantly below average." Id. Dr. Barry found plaintiff was able to attend to tasks, and was able to follow and understand simple directions and instructions. Id. However, she opined that plaintiff may have difficulty completing all age-appropriate tasks. Id. Dr. Barry found plaintiff to be "functioning in the borderline range of

intelligence and does demonstrate some learning delays." Id. Dr. Barry recommended evaluation by the school system for possible alternative educational placement such as special education programs. Id. at 387. Her prognosis was guarded to fair. Id.

### 3. **Acquiring and using information–summary**

A.S. has not been able to learn to read, write, and do math, or discuss history and science. She does not have and apparently cannot gain the skills to progress in academic situations. She is not able to use increasingly complex language. Her school records and testing demonstrate very serious interference with her ability to initiate, sustain, and complete academic activities. The standardized tests administered by Ms. Munski had two subtests results with 3 standard deviations below the mean and five subtests results with 2 standard deviations below the mean. Therefore, an extreme limitation is expected. See 20 C.F.R. § 416.926a(e)(3)(iii). The test results are consistent with A.S.'s daily functioning in the acquiring and using information domain reflected in her school records, particularly her reading grade level equivalent of grade one or early grade two, through her eighth grade year. Further, plaintiff's inability to read and her memory difficulties impact across all academic areas, very seriously interfering with her ability to initiate, sustain, and complete the acquiring and using of information. Her limitation in this domain is extreme.[2]

### 4. **Interacting and relating with others**

According to A.S., it was error for the ALJ to only mention that she was cooperative during testing without mentioning the objective test scores. Plaintiff points to her low

---

[2] It is noted that the ALJ's analysis of A.S.'s limitations in acquiring and using information consisted of three sentences in half of a paragraph. R. at 22. The other half of the paragraph concerned the ALJ's conclusion.

receptive and core language limitations and the impact those limitations could have on the domain of interacting and relating with others: "'<u>Language</u> provides the message of communication. It involves understanding what is heard and read (<u>receptive language</u>) and expressing what one wants to say to others, either orally or in writing (<u>expressive language</u>).'" Pl.'s Mem. at 14 (quoting Social Security Ruling 09-5p). There is no dispute that language difficulties <u>could</u> impact interacting and relating with others. However, in this case the evidence in the record establishes that plaintiff has less than marked limitations in this domain. <u>See, e.g.</u>, R. at 162 ("very likeable and friendly student . . . very cooperative and works well with her peers, adults, and in small groups); <u>id</u>. at 242 ("makes friends easily and fits in well socially on her own"); <u>id</u>. at 303 (she is "generally helpful and kind to her peers and demonstrates appropriate peer interactions"). Although there are a few instances where it is noted that plaintiff could be defiant and disrespectful, <u>see, e.g.</u>, 252, 258, 264–65, 288–90, substantial evidence in the record supports the ALJ's conclusion that she has less than marked limitations in interacting and relating with others.

### B. Credibility Assessment

The ALJ stated that he gave diminished weight to the testimony of A.S.'s mother that A.S. has "disabling academic and behavior problems," because it was somewhat inconsistent with the objective evidence. R. at 26. Regarding plaintiff's academics, the mother testified that although she has a special education teacher with her all day, the work is still to hard for her. R. at 35. This is perfectly consistent with the school and consultative examination reports, as set forth above.

Regarding plaintiff's behavior problems, the statement by the ALJ is not reflective of the complete testimony of the mother. The mother did testify that plaintiff had a bad attitude

at school, that the school people say she is very mean, she does not get along with her teacher, and the day before the hearing she just walked out of school. Id. at 36. She further testified that plaintiff is supposed to do her homework right after school, but plaintiff goes upstairs to lay down or runs outside. Id. at 37. However, she also testified that plaintiff has a friend from school, she allows plaintiff to go to her friend's house, and when the mother picks her up there were no problems with her behavior. Id. at 38–39. The mother also testified that plaintiff does chores around the house. Id. at 38. This testimony hardly constitutes an assertion of "disabling behavior problems."

Thus, the ALJ erred in giving the testimony of A.S.'s mother diminished weight. However, as set forth above plaintiff has an extreme limitation in the acquiring and using information domain, without regard to the mother's testimony. Since she has an extreme limitation in one domain her impairment(s) is functionally equivalent to a listing and she is disabled. Therefore, a remand for reevaluation of credibility, as requested by plaintiff, is unnecessary.

## V. **CONCLUSION**

The ALJ's finding that A.S.'s impairment(s) has only a marked effect on the acquiring and using information domain is not supported by substantial evidence. Review of all the evidence in the record reveals that her limitation in this domain is extreme. The ALJ's conclusion that plaintiff has a less than marked limitation in the interacting and relating with others is supported by substantial evidence. Although the ALJ improperly gave diminished weight to plaintiff's mother's testimony, the remedy of remand for reevaluation of credibility is not required.

A.S. has an extreme limitation in the acquiring and using information domain. Therefore, her impairment(s) is functionally equivalent to a listing and she is disabled pursuant to the regulations.

Accordingly, it is

ORDERED that

1. The plaintiff's motion for judgment on the pleadings is GRANTED;

2. The Commissioner's decision denying plaintiff disability benefits is REVERSED; and

3. This matter is REMANDED solely for calculation of benefits.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated: August 29, 2013
      Utica, New York.